IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

EUSTAQUIO E. AVILA,

        Plaintiff,

v.                                                           CIV 04-562 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

# **MEMORANDUM OPINION AND ORDER**

        The Social Security Administration ("Administration") awarded benefits to Plaintiff Eustaquio Avila, finding that he became disabled as of November 9, 2001.  Administrative Law Judge ("ALJ") William F. Nail, held a hearing to decide whether the onset of disability commenced earlier, but reached the same conclusion as the Administration.  *See, e.g., Administrative Record* ("*Record*") at 18, 28, 35.  After considering a letter from Plaintiff's mother, the Appeals Council declined review on April 12, 2004, thereby rendering the ALJ's decision final.  *Id.* at 5-6, 8, 163-65.

        This matter is before the Court on Plaintiff's motion to reverse or remand, where he asserts that the ALJ committed three errors.  *Doc. 9.*  Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  *See Docs. 3, 5.*  The entire record has been read and carefully considered .  I find that the matter should be remanded to the Commissioner for further proceedings.

## I.  Background

Born June 15, 1966, Plaintiff Eustaquio Avila has a high school education, where he attended special education classes, and some college.  He apparently injured his back as a young child resulting in back surgery to fuse vertebrae when he was a teenager.  The record does not contain a comprehensive picture of his employment.  His most recent job was as a cook's assistant and daycare provider at a "developmental center" for infants.  He stopped working on December 20, 2000, at age thirty-four and has not worked since.  After Avila injured his neck in an April 2001 motor vehicle accident, he applied for benefits with the Administration in June 2001.  Plaintiff  told the Administration that his disability began as of the date he quit working and that he quit working due to a back condition.  *See, e.g., Record* at 45, 49-54, 57, 59-60, 65, 72, 83, 171-74, 176, 179.

Plaintiff is uninsured and has few medical records.  *See e.g., id.* at 92, 97.  Other than the records concerning the motor vehicle accident, *see id.* at 87-91, it appears that he sought medical treatment on two other occasions.  A few months before he left work, he sought treatment because he was thirsty and was concerned about diabetes since his family has a history of the disease.  *See id.* at 97.  A few days before he left work, Avila sought treatment for back pain, which was treated with Motrin.  *See id.* at 92-96.

When Plaintiff submitted his application for benefits, an Administration employee noted that he "seemed depressed."  *Id.* at 70.  Avila told a consulting psychiatrist and ALJ Nail that he had "gone a few times" for treatment of his own mental problems.  However, there are no records of any such visits.  *See id.* at 175.

The first medical record that suggests that Plaintiff suffers from a mental condition arose

from consulting physician Dr. Eugene Toner's physical examination of Plaintiff. Dr. Toner's report, dated November 9, 2001, concludes that

> [t]his claimant's presentation and affect are somewhat unusual. He obviously does not take care of himself very well, and he does appear to be significantly circumstantial. There may be some psychiatric problems here, which needs (sic) appropriate evaluation to determine whether or not it meets disability specifications.

*Id.* at 101; *see also id.* at 99-100.

In March 2002, consulting psychiatrist Dr. Gerald S. Fredman examined Plaintiff and found him to be suffering from a psychotic disorder, possibly disorganized-type schizophrenia, as well as operating at GAF-level of "33, major impairment." *Id.* at 119; *see also id.* at 118. Dr. Fredman determined that Plaintiff was markedly limited in certain areas: ability to work without supervision; ability to work with coworkers and supervisors; and ability to adapt to changes in the workplace. He also was of the opinion that Plaintiff could not manage any benefits awarded to him. *See id.* at 119-21.

Agency psychologist Dr. J. LeRoy Gabaldon,[1] supplied Psychiatric Review Technique and Mental Residual Functional Capacity Assessment (MRFC) Forms in April 2002. *See id.* at 123-40. His MRFC form found Plaintiff markedly limited in a number of areas, consistent with Dr. Fredman's opinions. *See id.* at 123-24. Based on Dr. Gabaldon's MRFC and the absence of other documentation in the record, the Administration found Plaintiff disabled and determined the "most favorable onset date" to be the date of Dr. Toner's report. *See id.* at 28, 141. The CAASE Development note "rationale" specifically provides:

---

[1] Dr. Gabaldon's credentials are not in the record. In other opinions I have noted that he is a psychologist. *See Hardesty v. Barnhart,* CIV 03-1114 (*Doc. 15* at 6); *Gardom v. Barnhart,* CIV 03-699 KBM (*Doc. 16* at 7); *Chemereteff v. Barnhart,* CIV 01-1293 KBM (*Doc. 16* at 9).

> Dr. Gabaldon has prepared PRTF and MRFC and the claimant is markedly limited in multiple domains. . . . The claimant alleges an AOD of 12/00. Records from that time frame to present have been requested from UNM and there is nothing in those records to substantiate onset of 12/00. According to the information the claimant gave Dr. Fredman, he had some psychiatric treatment between 1989 and 1996, and none other that he can recall. The earliest date that any medical evidence documents mental problems is 11/09/2001. This is the date that the claimant had a physical exam with Dr. Toner, which led to a psychiatric CE. This appears to be the most favorable onset date that can be granted.

*Id.* at 141.

Accordingly, while the Administration had previously determined that Plaintiff's physical condition was not disabling, *see id.* at 26, 101, 106-07, 109-12, on April 9, 2002, it awarded benefits based on Plaintiff's mental condition as of the date of Dr. Toner's report, *id.* at 28, 35. Plaintiff (who had been represented by appointed counsel since before Dr. Fredman's examination) sought a hearing on the issue of the onset date. He asserted that his disability began when he stopped working approximately a year earlier than the Administration's determination. *See id.* at 12-13, 37-43.

Just before the March 18, 2003 hearing, Dr. Fredman wrote to Plaintiff's attorney stating that he had reviewed his prior report and was of the "opinion within a reasonable degree of medical certainty that the functional limitations I described in that report are also applicable to a period starting in December 2000." *Id.* at 147. ALJ Nail had Dr. Fredman's supplemental letter before him at the hearing, but both during the hearing and in his written decision, he found that he could not rely on the letter to establish an earlier onset date. *See id.* at 19-20, 179-80, 186. The ALJ's opinion provides in relevant part:

> The state agency doctors concluded that claimant's impairment

markedly limited him in [recitation of seven specific areas]. However, there is no evidence of any medically determinable mental impairment prior to the previously established onset date of November 9, 2001 (Ex. 3F).

Counsel submitted a letter from [Dr. Fredman] stating that, based on his examination of the claimant in April 2002, it was his opinion the limitations described were also applicable in December 2000 (Ex. 9F). However, this is clearly speculation on his part. There are no medical records that even hint at psychiatric symptoms for this period, and Dr. Fredman clearly has no treatment relationship with the claimant's (sic) that would give any objective support to his opinion (Ex. 5F). Therefore, I cannot credit the doctor's opinion regarding the onset date, as it is unsupported by any clinical findings or even evidence of any medically determinable mental impairment for the period at issue.

The claimant's back condition does not meet or equal the requirements of § 1.04A. . . .

\* \* \* \* \*

The claimant testified to shooting pain through his body which he claims is constant. He says that he soils himself and must wear diapers. However, he uses no medications for pain, and he has not received any medical treatment beyond emergency room visits (Exs. 5E and 1F). He told Dr. Toner that he had not taken any medication or received any medical treatment for more than a year (Ex. 3F). The doctor noted that the claimant's complaints were in excess of any objective findings and recommended a psychiatric evaluation (Ex. 3F).

The claimant's back pain would prevent him from lifting more than 20 pounds, but would not limit his ability to sit, stand or walk, according to [Dr. Toner] (Ex. 3F). He had no difficulty using his arms. Accordingly, I conclude that the claimant retained the capacity [to] perform the requirements of at least a light work and a limited range of medium work prior to the established on-set date.

The claimant has failed to establish that he was unable to perform the requirements of his past relevant work as a daycare worker as it is generally performed in the national economy prior to his established onset date of November 9, 2001. This job is classified

5

as light work.

> . . . I concur with [the opinion of the agency physicians] that the claimant is currently disabled within the meaning of the Social Security Act and Regulations, but not prior to November 9, 2001.

*Id.* at 19-20.

## II. Analysis

Plaintiff's three claims are interrelated and concern the findings about his mental capacity only. The decision about his physical impairments are not at issue.[2] Avila contends that ALJ Nail: (1) improperly rejected Dr. Fredman's supplemental opinion about the onset of Plaintiff's mental impairment; (2) failed to make detailed findings why Plaintiff could have performed his past relevant work as a childcare worker especially in light of Plaintiff's testimony that he had visual hallucinations while working and had fed a child food with a known allergy to it; and (3) failed to consider the mother's letter concerning when her son manifested psychological problems and the nature of those problems. *See Doc. 10.*

If substantial evidence[3] supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment

---

[2] Plaintiff contends for the first time in the reply brief that the physical demands of past relevant work as a daycare worker exceed Avila's limited lifting abilities. In context, however, Plaintiff seems most concerned with the ALJ's failure to "obtain a precise description of the particular job duties which are likely to produce tension and anxiety." *See Doc.13* at 1-2 (emphasis omitted).

[3] "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).

Defendants are correct that ALJ Nail gave valid reasons for rejecting Dr. Fredman's opinion that Plaintiff's disabling mental condition would have been present when he quit working in December 2000. However, that only holds true when that finding is viewed in isolation.

ALJ Nail's decision about the onset of Plaintiff's mental impairment focuses exclusively on medical documentation, specifically the absence thereof. Social Security Ruling ("SSR") 83-20 discusses how to determine the date of onset where, as here, a mental disability has been established. It is true that under the ruling, medical evidence is key to the determination:

> Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.
>
> * * * * *
>
> The medical evidence serves as the primary element in the onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling.

*SSR 83-20,* 1983 WL 31249 at **1-2 (1983).

However, medical evidence or absence thereof is not the exclusive source of information in making a determination particularly where, as here, there is a dearth of available medical information about Plaintiff's medical condition.

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.
>
> ***If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation.*** Information may be obtained from ***family members, friends, and former employers*** to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition. However, before contacting these people, the claimant's permission must be obtained. The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record.

*Id.* at *3.

Nowhere does the ALJ discuss Plaintiff's own testimony. Plaintiff essentially testified that he left his job and has not looked for work due to active psychosis, and also that his employer complained about his "ramblings."[4] The only testimony ALJ Nail discussed and evaluated for credibility was Plaintiff's testimony about physical limitations due to back pain. *See Record* at 19-

---

[4] *See Record* at 174 (not looking for work in part because "I have like emotional things."); *id.* at 175 (one of the things that kept him from working was that he "was seeing things," which he attributes to a family history of schizophrenia, like his brother who "runs around the street naked and stuff like that and without shoes in the wintertime."); *id.* at 178-79 (both physical and "mental thing" caused him to quit work; "I mean I'm not right in the head. . . . my father was discharged from the military because – well, he had electric shock treatment and all that. So it, I think, runs in the family."); *id.* at 181-82 (at work he was "quick-tempered . . . would ramble on . . . not liking women. . . . Just like seeing them that they're out to get me. Like paranoid I think is the term. . . . [thought he saw a woman with male genitalia] then I knew for sure that, you know, that I'm in bad straights mentally. . . . But then also, like I say, I would ramble on about things.").

20.

Moreover, Plaintiff asserts that ALJ Nail had a copy of a letter from Avila's mother before him when he issued his decision but did not discuss the letter at all. *See Doc. 10* at 9; *Doc. 11, Exh. A.* That letter, signed in June 2003, after the hearing but well before the opinion issued, provides that Plaintiff's mother observed that Plaintiff began suffering from "mental problems" as of 1998:

> I know that there were problems with Eustaquio because I have a younger son who suffers from schizophrenia and noticed some of the same behavior patterns in Eustaquio. Eustaquio would not understand or remember what I was saying to him and appeared to be in another place. His concentration became less and less, and in addition to his pain I think that was also the reason he quit college. Eustaquio began saying strange things, and would often forget what day it was, or what he was doing. Eventually, Eustaquio just withdrew from everything and now leaves home only to go to appointments, he has no friend or social activities.
>
> I know that if Eustaquio could have continued working he would have, if not for his pain the mental problems that began happening to him in the mid- to late 90's.

*Id.* at 165. Defendant does not appear to dispute that ALJ Nail had seen the mother's letter.[5]

---

[5] Based on the record presently before me, I am not at all convinced that ALJ Nail saw this letter before his decision was filed. By a cover letter dated a few days before the opinion issued, counsel for Plaintiff sent ALJ Nail a copy of this letter "Via Fax #346-7862 & US Mail." *Record* at 163. In this cover letter, counsel also references a previous "request" he made on June 25, 2003. It is not plain from the face of the record what counsel requested of ALJ Nail on June 25, 2003. However, the mother's typed letter appears to have been written by an attorney since, aside from the language throughout the letter above, it concludes: "If I were called to testify at [the] hearing I would state the foregoing. I declare under the penalty of perjury, under the laws of the state of New Mexico that the foregoing is true and correct to the best of my knowledge." *Id.* at 165. Her letter is dated two days after counsel's June 25th request. Accordingly, I presume that on the 25th counsel requested Judge Nail to allow him to belatedly supplement the record with this letter, and he agreed. *See id.* at 163, 165.

Indeed, ALJ Nail had granted counsel's request to keep the record open until April 2nd and stated: "If you need more time, I'll be glad to extend it, but you'll need to write me a letter stating you need more time." *Id.* at 169. During and at the end of the hearing, ALJ Nail told counsel that the dearth of evidence

Instead, Defendant argues that "[a]lthough the ALJ did not specifically discuss [the letter, his] ***statement that he considered the entire record shows*** that the ALJ did in fact consider the statement before [he] made his disability determination." *Doc. 12* at 6 (emphasis added).

While an ALJ need not discuss "every piece of evidence," the record must establish that he considered ***all*** of the evidence. *E.g., Oslin v. Barnhart,* 69 Fed. Appx. 942, 947 (10th Cir. 2003) (emphasis added) (and cases quoted and cited therein). However, an ALJ "'may not ignore evidence that does not support his decision, especially when that evidence is significantly probative.'" *Id.* And, this Court's review cannot be based upon

> speculation. "There are specific rules of law that must be followed in weighing particular types of evidence in disability cases," and the failure to follow these rules is reversible error. . . . ***Where the record on appeal is unclear as to whether the ALJ applied the appropriate standard by considering all the evidence before him, the proper remedy is reversal and remand.*** . . .

*Baker v. Bowen,* 886 F.2d 289, 291 (10th Cir. 1989) (emphasis added).

---

on the mental impairment created a "problem" because Dr. Fredman's supplemental letter was not sufficient. "I got to have something I can hang my hat [on]. . . . I don't have a thing in terms of medical evidence, you know, to show a beginning of any medical disability. That's my – is there anything out there that you can get for me? . . . [W]e'll see what we can get. . . . I hope you can kind of appreciate my problem here. . . . there's not any evidence of any mental treatment or anything . . . do the best you can for me, okay?" *Id.* at 179-80, 186.

Thus, it appears that the mother's letter was precisely the type of information ALJ Nail was seeking. But despite the mother having signed the letter on June 25th, for reasons not disclosed counsel waited until late in the afternoon on July 18th to fax and mail a copy of the letter to ALJ Nail. *See Doc. 11,* Exh. A (copy of a transmittal sheet). The copy of the letter in the Record is date stamped July 23, 2003, which is the same date as ALJ Nail's opinion. *Id.* at 163. The Record does not contain or acknowledge the receipt of a faxed copy.

Given ALJ Nail's self-described evidentiary "problem," it is reasonable to assume that, had he received the mother's letter before the opinion issued, he would have mentioned it in his opinion. I am therefore inclined to believe that he did not receive it.

Regardless of whether ALJ Nail timely received a copy of the mother's letter or not,[6] the boilerplate language that he considered "all" of the evidence is not sufficient grounds to affirm his decision.[7]  Because other sources of information about onset are relevant in this case, ignoring the mother's letter and failing to discuss Plaintiff's own testimony is not an application of the correct legal standards.  Furthermore, ALJ Nail did not explore the possibility of contacting Plaintiff's former employer as the Ruling above suggests.  Finally, if the lay testimony ***had*** been considered in conjunction with Dr. Fredman's supplemental letter, ALJ Nail may have been convinced that the doctor's letter was entitled to something other than no weight.

Since ALJ Nail's "past relevant work" finding hinges on his determination of when onset occurred, I cannot conclude that his conclusion is based on the correct legal standards either.  Indeed, Plaintiff was found disabled based on his mental condition, and ALJ Nail's discussion of the demands of the prior work does not consider the mental demands of the work.  *See Record* at

---

[6] If ALJ Nail did not receive the letter, the Appeals Council "considered" it and found it "does not provide a basis for changing" ALJ Nail's decision.  *See Record* at 5, 8.  As such, the Appeals Council implicitly determined that the letter was "new," "material," and "related" to the relevant period.  Therefore, I must consider the letter in evaluating ALJ Nail's decision.  *See, e.g., Chambers v. Barnhart,* ___ F.3d. ___, 2004 WL 2668759 (10th Cir. 2004) (not demarcated with star pagination); *Bolton v. Barnhart,* 2004 WL 2677695 at * 3 (10th Cir. 2004).

[7] *See Oslin,* 69 Fed. Appx. at 947 (remand where, among other things, ALJ cited boilerplate language that all evidence was considered, but did not mention GAF scores or fully discuss mental progress note, so it was unclear whether he considered or rejected this favorable evidence); *Barnes v. Apfel*, 188 F.3d 518 at *1 n.1 (10th Cir. 1999) (unpublished) (the ALJ decided not to consider certain medical records, yet stated he carefully reviewed all of the medical evidence except certain "omitted" exhibits.  Court noted that "[t]his kind of general disclaimer does not excuse an ALJ from careful consideration of all the relevant evidence and from linking findings to specific evidence. . . . we cannot tell which exhibits he omitted.  This failure may itself be grounds for reversal.  *See Baker v. Bowen,* 886 F.2d 289, 291 (10th Cir. 1989).  Indeed, actual reliance on the boilerplate could itself result in reversal, since certain of the ALJ's stated criteria for omitting consideration of medical exhibits--such as the failure of a physician to state a diagnosis--contradict an ALJ's duty to consider all relevant  medical evidence . . . .  This is especially true where, as here, the ALJ relies on a paucity or lack of complaints to treating sources on the record to reject claimant's allegations of disabling pain.")

20-21; *Doc. 10* at 7.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 9)* is granted, and the matter is remanded to the Commissioner for further proceedings. A final order will enter concurrently herewith.

                                             *Karen B Molzen*
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.